## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, James M. Staton, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I am employed as a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations office (DHS ICE HSI) in Boston, Massachusetts. I have been a Special Agent with DHS ICE HSI since July 2011. I graduated from the Federal Law Enforcement Training Center in Brunswick, Georgia in January of 2012, where I received specialized training including, but not limited to, investigating violations of federal law relating to narcotics, as well as training in drug smuggling, drug identification, immigration law, child exploitation, defensive tactics, firearms, and criminal law. Prior to my employment as a Special Agent with Homeland Security Investigations, I was employed as Border Patrol Agent with the Department of Homeland Security from July of 2007 through July of 2011. I graduated from Clemson University in South Carolina, with a Bachelor of Science in Business Management, and received a master's degree from the University of Arizona in International Security Studies.  During my tenure as a Special Agent, I have conducted numerous types of investigations including human smuggling, immigration violations, narcotics and related money laundering.  During the investigation of these cases, I have participated in the execution of search and arrest warrants.

2.       Together with other Special Agents and investigators from DHS ICE HSI, the United States Department of Labor, Office of Inspector General, Office of Investigations (DOL OIG OI), and the Internal Revenue Service, Criminal Investigation, I am currently investigating several individuals, including CHELBE WILLAMS MORAES ("**CHELBE**"); CHELBE's brother, JESSE JAMES MORAES ("**JESSE**"); **JESSE**'s son and **CHELBE**'s nephew, HUGO

GIOVANNI MORAES ("**HUGO**"); two of **CHELBE**'s relatives identified herein as Relative 1 and Relative 2; **TONY ANGEL CHACON-GIL a/k/a "MARQUITO" a/k/a "MARCOS CHACON" ("CHACON-GIL" or "MARQUITO")** and others (collectively, the "Target Subjects"), for violations of: Title 8, United States Code, Sections 1324(a)(1)(A)(i) and (B)(1) (knowing that a person is an alien, bringing to or attempting to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien); 1324(a)(1)(A)(iv) and (B)(1) (encouraging and inducing an alien to come to, enter, and reside in the United States for commercial advantage or private gain, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law); 1324(a)(1)(A)(v)(I) and (B)(i) (conspiracy to commit and aiding and abetting the previous acts); and 1324(a)(3)(A) (during any 12-month period, knowingly hiring for employment at least 10 individuals with actual knowledge that the individuals are aliens who are unauthorized and have been brought to the United States in violation of this subsection); and Title 18, United States Code, Sections 1956(a)(1)(B)(i) (concealment money laundering); 1956(a)(2)(A) (international promotion money laundering); 1956(h) (money laundering conspiracy); and 1028(a)(2) (knowing transfer of a false identification document knowing that such document was produced without lawful authority); among other offenses  (the "Target Offenses").

3.     This affidavit is submitted in support of criminal complaints: (a) charging **JESSE** and **HUGO**  with conspiracy to encourage and induce an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and

residence is or will be in violation of law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and (B)(i), all in violation of 1324(a)(1)(A)(v)(I) and (B)(i); and (b) charging **CHACON-GIL** with knowing transfer of a false identification document knowing that such document was produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2); and  illegal re-entry of a removed alien in violation of 8 U.S.C. § 1326.

4.      I am a Special Agent and have conducted this investigation working closely with other Special Agents and law enforcement personnel.  The facts in this affidavit come from my personal observations and review of records, my training and experience as an HSI Special Agent, and information obtained from other law enforcement personnel and witnesses. Since this affidavit is being submitted for the limited purpose of securing search warrants, I have not included every fact known concerning this investigation. I have only set forth the facts necessary to establish probable cause that **JESSE**, **HUGO** and **CHACON-GIL** have committed the charged offenses.

## PROBABLE CAUSE

### Overview of the Human Smuggling Investigation and Targets

5.      This investigation has shown that **CHELBE**, and at times **JESSE**, recruits individuals in Brazil who wish to be smuggled into the United States.  For a substantial fee, **CHELBE** arranges for them to travel to the United States through Mexico and enter the United States, usually at a point other than an authorized port of entry.  **CHELBE** sometimes encourages the migrants to make false claims that unrelated migrants are part of the same family unit and to make false applications for asylum.  He also gives them fake contact information for individuals who pose as the U.S. point of contact for the migrants.  In some cases, **CHELBE** gives, or offers to give, the migrants false documentation to support their claims.  Once the migrants are in the United States, **CHELBE** uses relatives and friends in the United States to collect the smuggling debt and to provide the migrants with employment and immigration representation.  While **CHELBE** has sent migrants to different parts of the United States, he has sent many to Massachusetts, where his main co-conspirators are **JESSE**, **HUGO**, Relative 1 and Relative 2.

6.      Among other things, **JESSE** and **HUGO:** employ the migrants in their restaurants[1] and advise them and their families about other jobs; pay the migrants, at least partly in cash, usually well below the minimum wage, and often withholding all or part of the migrants' pay and applying that money to the migrants' smuggling debt or their rent; find them a residence and loan them

---

[1] **JESSE** and **HUGO** operate two restaurants in Woburn, MA: **TASTE OF BRAZIL— TUDO NA BRASA, LLC**, 414 Main Street, Woburn, Massachusetts ("**TASTE OF BRAZIL**" or "**TUDO NA BRASA**") and **THE DOG HOUSE BAR & GRILL, LLC**, 434 Main Street, Woburn, MA ("**THE DOG HOUSE**" and, together with **TASTE OF BRAZIL**, "**THE RESTAURANTS**")

money for rent and utilities; collect or assist in the collection of the migrants' smuggling debt payments, including encouraging them to pay their smuggling debt and at times issuing explicit or veiled threats about the consequences of nonpayment; and provide general advice to the migrants about residing in the United States.

7.      Among other things, Relative 1 and Relative 2: collect and assist in the collection of the migrants' smuggling debt payments and wire money to **CHELBE** and to migrants and others to facilitate the smuggling operation.

8.      **CHACON-GIL** sells false identification documents, including Social Security cards and Permanent Resident cards ("Green Cards"), to migrants smuggled in by members of the conspiracy to facilitate their work without authorization.

**Indictment of CHELBE**

9.      On June 1, 2021, a United States grand jury sitting in this district returned a sealed four-count indictment against CHELBE charging him: in Count One with conspiracy to encourage and induce an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law, and doing so for commercial advantage or private gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) and (B)(i); in Count Two with  encouraging and inducing an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law, and doing so for commercial advantage or private gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and (B)(1); in Count Three with conspiracy to commit international promotion money laundering and concealment money laundering, in violation of Title 18, United States Code, Section 1956(h); and in Count Four with international promotion money laundering in violation of Title 18, United

States Code, Section 1956(a)(2)(A).  *United States* v. *Chelbe Moraes*, Criminal Number 1:21-cr-10175-ADB.  CHELBE has not been arrested on this indictment.  He is a citizen of Brazil and, according to law enforcement sources in Brazil, has been living in Brazil since this indictment was returned.  I have been informed that Brazil will not extradite a Brazilian citizen to face these charges.

### The Operation of the Smuggling Organization

10.   Multiple sources that have been smuggled into the United States from Brazil[2] by **CHELBE**'s organization have provided information and evidence about the operation of the smuggling organization and communications with the targets.  Their information/evidence along with other evidence developed in this investigation are described below.

   *a.*   "SOI" is a source of information who, with a spouse and two children, was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2018.  SOI's information is discussed starting at paragraph 8 of this affidavit.

   *b.*   "CW-1" is an individual who was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2019.  CW-1's information is discussed starting at paragraph 11 of this affidavit.

   c.   "SOI-2" is CW-1's relative.  Like CW-1, SOI-2 was smuggled into the United States from Brazil (in a separate trip) by **CHELBE** and other Target Subjects in 2019.  SOI-2's information is discussed starting at paragraph 18 of this affidavit.

---

[2] Each migrant described below lacked a visa or any other lawful means of entering the United States at the time they entered the United States.

6

d. "CW-2" is an individual who was smuggled into the United States from Brazil, with two of CW-2's children, by **CHELBE** and other Target Subjects in 2018. CW-2's information is discussed starting at paragraph 22 of this affidavit.

e. "SOI-1" is CW-2's relative. Like CW-2, SOI-1 was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2018. SOI-1's information is discussed starting at paragraph 41 of this affidavit.

f. "Individual 5" and "Individual 6" are individuals who were smuggled into the United States from Brazil, at the same time as CW-2, by **CHELBE** and other Target Subjects. Information about these individuals is discussed starting at paragraph 18 of this affidavit.

g. "Individual 7" is a former employee of **TASTE OF BRAZIL** who entered the United States illegally in 2016. Information about this individual is discussed starting at paragraph 33 of this affidavit.

h. Individuals 1-3 are individuals who were smuggled into the United States from Brazil by **CHELBE** and other Target Subjects. Information about these individuals is discussed starting at paragraph 31 of this affidavit.

i. "SOI-3" is a relative of Individual 2. SOI-3 was smuggled into the United States from Brazil in 2021 by **CHELBE** and other Target Subjects. SOI-3's information is discussed starting at paragraph 46 of this affidavit.

### *Smuggling of SOI and Family*

11.     A source of information ("SOI") advised investigators that SOI and SOI's spouse ("SOI's spouse") along with two children, were smuggled into the United States from Brazil in 2018 by **CHELBE** and members of his family for a total fee of approximately $32,000. SOI said

a co-worker of SOI's spouse in Brazil put them in touch with **CHELBE** about travel to the United States. **CHELBE** then traveled to their home in Brazil to discuss the process and to sign a contract once an agreement was made. SOI later stated that anyone in Brazil who wants to go to the United States knows to contact **CHELBE**. SOI said that to make the trip sound more appealing and legitimate, **CHELBE** told SOI his brother owned a restaurant in the United States that SOI could work at, and his brother would travel to Brazil to meet with them and prove to them the restaurant existed. SOI said that **CHELBE**'s brother **JESSE** flew to Brazil and met with SOI and **CHELBE** at their house when they discussed the details of their smuggling trip. SOI stated **CHELBE**'s brother was the owner of **TUDO NA BRASA** and was aware of "everything going on."

12.     SOI described **CHELBE** as "the boss" or "jefe" and said he had people in Mexico working for him. SOI said that SOI and SOI's spouse were responsible for the $24,000 fee to smuggle them and their daughter into the United States and that the mother of SOI's spouse's son was to pay the remaining $8,000. SOI said they paid approximately half of the smuggling fee up front and were required to pay the balance in monthly installments of approximately $1,450 beginning six months after reaching the United States. SOI said they signed a contract, or promissory note, with **CHELBE** in Brazil agreeing to these terms.

13.     SOI stated that SOI, SOI's spouse, SOI's daughter, and SOI's spouse's son left Brazil together and headed for Mexico City. SOI stated that a man in Mexico received instructions from **CHELBE** to have the family split up into two groups of two to cross into the United States. SOI said **CHELBE** instructed SOI to lie to immigration authorities at the border and say SOI was not married and that SOI did not know where SOI's spouse was at the time of SOI's apprehension.

14.     SOI stated that **CHELBE** instructed SOI to provide the name of someone whose first name was "Karine" to U.S. immigration authorities as SOI's U.S. point of contact and say

Karine was SOI's friend, even though SOI did not know "Karine."  **CHELBE** told SOI to tell U.S. immigration authorities that if SOI was allowed to enter the United States, SOI would be staying with their friend in Warminster, PA.  Once SOI was in the United States, they[3] contacted "Karine" at a phone number **CHELBE** gave them.  "Karine" referred SOI to someone with Relative 3's first name who SOI said was an attorney in Woburn, Massachusetts.  Based on information uncovered during this investigation, it is believed that this was Relative 3.  Relative 3 does not appear to be an attorney but has represented migrants smuggled by **CHELBE** at immigration interviews and other proceedings.  The person with Relative 3's first name told SOI that they could stay at a particular address in Woburn (the "Woburn house").  SOI stated that anyone who used **CHELBE**'s services, who worked at **TUDO NA BRASA**, lived at the Woburn house when they first got to the United States.

15.    According to records of the City of Woburn Assessor's Database, the Woburn house has been owned since 2008 by someone who is related by marriage to **HUGO**.  I believe, based on my training and experience and work on this investigation, based on **HUGO**'s family member's ownership of the Woburn house, and based on other facts discussed in this affidavit, that **HUGO** arranged, directly or indirectly, for migrants who have been smuggled into the United States to stay at the Woburn house.

16.    SOI stated that while they were in Texas, the person with Relative 3's first name and "Karine" instructed them not to go to the Warminster, PA address but to go to the Woburn

---

[3] Unnamed individuals are referred to in this affidavit with third person plural pronouns to avoid disclosing their gender.

house. According to SOI, **CHELBE**/Karine paid for SOI's Southwest Airlines flight from Texas to Massachusetts.

17.     Upon arriving in the United States, SOI stated that they worked at **TUDO NA BRASA** for approximately one month.  SOI told investigators the work was very hard.  SOI was required to carry heavy sacks of potatoes and other heavy items.  SOI stated they were paid $3.00 per hour, did not receive any tips, and worked 7:00 am to 9:00 pm.  SOI stated they told **JESSE** and **HUGO** (who co-owned and co-managed **TUDO NA BRASA**) that SOI was not able to lift such heavy items and could no longer work at **TUDO NA BRASA**, to which they told SOI "You're out, and out of [the Woburn house]."  SOI stated **JESSE** and **HUGO** brought SOI to the basement of **TUDO NA BRASA** and yelled at SOI.  They told SOI they wanted SOI to work at the restaurant, but if SOI did not, SOI could not stay at the Woburn house. SOI stated **JESSE** told SOI that if SOI did not cooperate, they would call Immigration and have them deported. SOI explained **HUGO** is **JESSE**'s son.  SOI stated "they" used the second floor of the Woburn house to house their employees and that if you did not work at **TUDO NA BRASA** you could not live there. SOI stated at one point both SOI and SOI's spouse worked at **TUDO NA BRASA** and never received money for their work. SOI was told the work they did at the restaurant went toward their monthly rent of $1,400 at Center Street.  SOI stated SOI had a zero balance for rent that month.[4]

*** Smuggling of CW-1 ***

---

[4] Based on SOI's statements, SOI worked approximately 14 hours a day with no days off for approximately one month. Based on this work at $3.00 per hour, SOI should have received a check for approximately $1,260.

18.     CW-1, an individual who began cooperating with this investigation after unlawfully entering the United States,[5] has provided detailed information as follows about how **CHELBE** arranged for CW-1 to travel from Brazil to the United States and to enter the United States unlawfully. Specifically, in or about March 2019, CW-1 first contacted **CHELBE** in Brazil to discuss their interest in being smuggled into the United States. CW-1 received **CHELBE**'s number from a friend who had been smuggled into the United States. During this initial phone conversation, **CHELBE** assured CW-1 passage into the United States, described the travel route, and discussed his smuggling fee. **CHELBE** and CW-1 agreed upon a smuggling fee of $22,000, which included payment for smuggling CW-1's family. CW-1 agreed to pay $10,000 in advance and to pay **CHELBE** the remainder of the smuggling debt in 15 monthly payments of $800 after entering the United States. **CHELBE**'s initial price was $20,000, but he added $2,000 in interest after he agreed to accept payment in installments.

19.     Before leaving Brazil, CW-1 met twice with **CHELBE**, once at CW-1's residence and once at a hotel. **CHELBE** told CW-1 he is a lawyer and the mayor of a city near Governador Valadares, in the state of Minas Gerais, Brazil. A family member of CW-1 living in Massachusetts agreed to pay **CHELBE** the $10,000 down payment for CW-1's smuggling trip. **CHELBE** instructed CW-1's family member to make the payment to **CHELBE**'s relative, Relative 1, who was living in Woburn, Massachusetts and messaged a photo of Relative 1 to CW-1's family

---

[5] CW-1 was born and raised in Brazil. CW-1 has no criminal record in the United States, and I am unaware of any criminal record of CW-1 in Brazil. CW-1 has been informed by agents that their cooperation in this investigation could result in permission to remain in the United States. CW-1 has received Deferred Action and Employment Authorization from DHS as a result of CW-1's cooperation in this investigation. HSI has paid $4,100 toward CW-1's debt to **CHELBE**.

member. In early April 2019, Relative 1 drove to CW-1's family member's house and collected the $10,000 smuggling payment

20.     CW-1 and their family began their smuggling trip by taking a bus from Belo Horizonte to Sao Paulo, Brazil. According to CW-1, **CHELBE** paid for the bus tickets. Prior to this, at **CHELBE**'s instruction, CW-1 texted **CHELBE** a photo of CW-1 with their family. In addition, **CHELBE** gave CW-1 a credit card that was to be used during the trip. Once CW-1 arrived in Sao Paulo, **CHELBE** arranged for CW-1 and their family to be picked up by **CHELBE**'s associates.

21.     The next day, CW-1 and their family flew from Sao Paulo, Brazil, to Cancun, Mexico. At **CHELBE**'s instruction, CW-1 took a taxi from the Cancun airport to a specified hotel in Cancun. According to CW-1, **CHELBE** booked and paid for their room. **CHELBE** provided CW-1 with a phone number of a Brazilian individual who worked for **CHELBE** and lived in Cancun. This individual gave CW-1 five hundred pesos. During CW-1's stay at the hotel in Cancun, at **CHELBE**'s instruction, CW-1 purchased a new SIM card for their phone so CW-1 could continue to communicate with **CHELBE**.

22.     A taxi driver who worked for **CHELBE** picked up CW-1 and their family at the hotel in Cancun and took them to the Cancun airport. From Cancun, they took a flight to Ciudad Juarez, Mexico, which is on the Rio Grande River just south of El Paso, Texas. At **CHELBE**'s instruction, CW-1 took a taxi from the airport to a specified hotel in Ciudad Juarez. According to CW-1, the hotel was full, with many people waiting to cross illegally into the United States. A Brazilian individual affiliated with **CHELBE** met CW-1 at the hotel and asked who their smuggler was. CW-1 responded that they were with **CHELBE**. The Brazilian individual then brought CW-1 and their family to a room and said he would return to talk.

23.     While CW-1 was at the hotel in Ciudad Juarez, they received a message from **CHELBE** over WhatsApp. **CHELBE** instructed CW-1 to write down the contents of the message and give it to Immigration authorities in the United States when CW-1 was arrested. The message contained the name, address, and telephone number of his purported U.S. point of contact who purportedly lived in Everett, MA and had a phone number ending in 7505.[6]  CW-1 did not know such an individual and had no intention of ever going to this address.

24.     At approximately 7:30 p.m., an individual went room by room and told the hotel occupants to go to the hotel lobby. CW-1 and their family, along with approximately 30 to 40 other people, were placed in four vans and driven to the United States border at a place other than an official Port of Entry. The van drivers appeared to be Mexican and communicated with one another by portable radios. CW-1 and their family walked through the Rio Grande River where the water level was low and were apprehended by U.S. Border Patrol agents shortly after crossing the border.

25.     After CW-1's arrest in the United States, Immigration authorities placed CW-1 and their family in a shelter. CW-1 contacted **CHELBE** from the shelter, and **CHELBE** instructed CW-1 to go to a motel upon their release. CW-1 paid for the motel room using the credit card **CHELBE** had given to them.  **CHELBE** was to purchase plane tickets for CW-1 and their family from El Paso, Texas to Boston, but delayed doing so due to high prices. According to CW-1, ultimately, Relative 1 wired the money from Massachusetts to Texas for the plane tickets. CW-1 and their family then traveled by plane from El Paso to Boston.

---

[6] See section below on *The Use of the YMAX Accounts to Provide Fake U.S. Contact Information*.

26.     After CW-1 arrived in Massachusetts, **CHELBE** contacted a family member of CW-1's and gave CW-1's family member contact information for **CHELBE**'s brother **JESSE**. **CHELBE** told CW-1's family member that his brother owns a Brazilian restaurant in Woburn and that CW-1 should call **CHELBE**'s brother if CW-1 needed a job. I have confirmed that the phone number **CHELBE** provided, **(***) ***-0068**, is subscribed to and used by **CHELBE**'s brother, **JESSE**, who co-owns and operates **TASTE OF BRAZIL** restaurant in Woburn with his son, **HUGO**.

27.     Shortly after CW-1 arrived in Massachusetts, **CHELBE** sent CW-1 a WhatsApp text message with Relative 1's name and address and instructed CW-1 to make payments to Relative 1 for CW-1's smuggling debt. **CHELBE** also told CW-1 to give Relative 1 the credit card that **CHELBE** gave CW-1 for the smuggling trip to the United States.

28.     On July 8, 2019, CW-1 sent Relative 1 a text message at Relative 1's number ***-***-5201 saying, "I have the money for two installments for the trip I did with your father to come here to the USA. I wanted to know how can I deliver it."  CW-1 asked Relative 1 to give them the amount, and Relative 1 replied that "my dad was supposed to check the cost of the tickets [a]nd I will give it to you."  A few days later, CW-1 texted Relative 1, "Good morning, did you confirm the price for me? Because you got 10 thousand dollars from my [relative], so I told [my relative] that we have 12 thousand left. That it was 22 thousand the cost of the trip, but [my relative] is saying that it's 20 thousand the trip, that we are missing 10."  Relative 1 did not immediately respond to this text, but subsequently offered to have CW-1 bring the payment to their house and ultimately directed CW-1 to pay $1,000 to their aunt, because they were not available that day.  I believe, based on my training and experience and work on this investigation, that this text exchange shows that Relative 1 knows that the money they were collecting was for smuggling debts owed

to their father, because no legitimate trip from Brazil to the United States by CW-1 would cost $20-22,000.

29.    Once CW-1 began cooperating with HSI, CW-1 was shown a photo of **CHELBE** and identified him as the person CW-1 paid to smuggle them into the United States. CW-1 also identified **CHELBE**'s contact number as +******** **3586**.  WhatsApp activity reveals that this number is used by **CHELBE**.

30.    Approximately 10 weeks after CW-1 arrived in the United States, CW-1 had a consensually recorded phone conversation with **CHELBE** under the supervision of an HSI Special Agent pursuant to this investigation. This conversation has been translated from Portuguese into English.[7] **CHELBE** was using a phone assigned number +**** **** **3586** for this call. During this conversation, in which **CHELBE** identified himself as "Chelbe," **CHELBE** discussed obtaining documents for CW-1. **CHELBE** also told CW-1 that CW-1 must file a claim for humanitarian asylum "yesterday." **CHELBE** gave CW-1 the name of another relative, Relative 3, who **CHELBE** said could assist CW-1 with the asylum claim. **CHELBE** said, "[I]f [they] talk[] about documents that will be needed here from Brazil, this and that, then that's with me." **CHELBE** also told CW-1 that he would be sending the contact information for Relative 1, who lives near CW-1, and said that they are the one who takes care of **CHELBE**'s business in the United States, while his wife takes care of his business in Brazil.

---

[7] All communications between the targets of this investigation and cooperating individuals were in Portuguese, and all summaries and quotations from those communications in this affidavit are translations.

31.    On February 24, 2020, **CHELBE** sent two WhatsApp voice recordings to CW-1 asking them to wire $300 to a Brazilian who was in Cancun and needed the money urgently for food and a hotel.   That afternoon, at agents' direction CW-1 sent $300 of official U.S. funds via MoneyGram to this person in Cancun.   HSI has the receipt from the transaction.   On March 5, 2020, U.S. Border Patrol agents arrested this person after he entered the United States unlawfully about one mile west of the Paso Del Norte Port of Entry in El Paso, TX.   This person gave agents a U.S. point of contact number of ***-***-7505, which is a YMAX phone number associated with **CHELBE**.[8]

32.    On July 31, 2020, CW-1 met with **JESSE** at **TASTE OF BRAZIL**. This meeting was audio and video recorded. CW-1 said they needed to make a payment to **CHELBE** but Relative 1 was not available to collect it.   **JESSE** told CW-1 that CW-1 could send it to **CHELBE** directly, but CW-1 said they did not know how to do that.   **JESSE** then walked with CW-1 to a Brazilian meat market in Woburn that processes electronic financial transactions and gave CW-1 directions for wiring the $800 smuggling debt payment, which consisted of official U.S. funds, to **CHELBE** in Brazil.

33.    CW-1 continues to reside in the United States and has continued to make payments at agents' direction toward their smuggling debt to **CHELBE**.

### *Smuggling of SOI-2*

34.    A source of information ("SOI-2"), who is a relative of CW-1's, was also smuggled into the United States by **CHELBE**. On October 1, 2019, U.S. Border Patrol agents apprehended

---

[8] See section below on *The Use of the YMAX Accounts to Provide Fake U.S. Contact Information*.

SOI-2 and their spouse and child after they illegally entered the United States approximately one mile east of the Paso del Norte Port of Entry in El Paso, Texas. SOI-2 and their family crossed the border with 16 other Brazilian nationals. According to SOI-2, the entire group was smuggled into the United States by **CHELBE**. SOI-2 provided the following information about their smuggling trip.

35.     SOI-2 stated that they contacted **CHELBE** after CW-1 was smuggled into the United States by **CHELBE**. SOI-2 sold their car and gave **CHELBE** the proceeds, along with an apartment owned by SOI-2's spouse, as a down payment for the smuggling trip. Once in Massachusetts, SOI-2 was expected to pay an additional $8,000 to **CHELBE** in 10 monthly installments of $800. **CHELBE** told SOI-2 to give the monthly payments to Relative 1 "in hand."

36.     Prior to leaving Brazil, **CHELBE** gave SOI-2 a fraudulent marriage certificate for two other migrants who would be traveling with SOI-2: Individual 5 and Individual 6.  **CHELBE** instructed SOI-2 to give the fraudulent marriage certificate to Individual 5 at a hotel in Cancun, Mexico.[9] **CHELBE**'s driver drove SOI-2 and their family to the airport in Belo Horizonte, Brazil, but they missed their departing flight. Eventually, SOI-2 and their group of migrants flew from Brazil to Cancun, Mexico via Peru. From Cancun, they flew to Ciudad Juarez, Mexico.

37.     At 10:34 am on October 3, 2019, **CHELBE** left a voice recording for SOI-2 over WhatsApp in which he said:

---

[9] During an interview after being apprehended by U.S. Border Patrol agents, Individual 5 presented a marriage certificate to prove their marriage to Individual 6 was legitimate. Individual 5 told agents that Individual 6 was the biological parent of their minor child. DNA testing by CBP later determined that Individual 6 was not the biological parent of the minor child.

Hey [SOI-2] [PH], now you don't miss a flight anymore, right [SOI-2]? [LAUGHS] I can tell that now… [LAUGHS] Now we have learned, haven't we? [LAUGHS] Now you will always arrive ahead of time. That's all right. You are going to have a nice trip, and everything is going to be okay. No problems. Going up there, the Federal knows that you guys are coming. They are not going to give you guys problems. If they do stop you, you can be sure that they will let you guys go. Okay? And when you guys reach the city of Juarez the Federal knows about you [LAUGHS] as well. It's all paid…they will not give you guys problems either. You guys will arrive, go down and go to the hotel and tonight, God willing, you all will be inside the United States. This is a direct flight. You guys are going direct to the border. It doesn't stop anywhere. Got it? It is a great flight. It's a special flight for you guys.

Based on my training and experience and work on this investigation, I believe **CHELBE** was referring to the fact that his organization had bribed Mexican Federal Police to allow SOI-2 and other migrants being smuggled by **CHELBE** to pass through Mexico to the United States border.

38.     The day after they missed the flight, **CHELBE** drove SOI-2 and their family to the airport himself. **CHELBE** was accompanied by two minor children. He told SOI-2 that he was getting the minors fake birth certificates to show they were brother and sister for a future smuggling trip.

39.     SOI-2 and the rest of the migrants in their group flew together from Cancun to Ciudad Juarez. Upon arrival, the group was detained by Mexican Federal Police officers. The officers took a photo of SOI-2's group. While they were being held by the police, SOI-2 sent **CHELBE** a text via WhatsApp and informed him of the detention. **CHELBE** said not to worry and that he had already received the photo of the group taken by the police officers.

40.     After being released, the group took taxis to a hotel in Ciudad Juarez according to **CHELBE**'s instructions. While they were at the hotel, **CHELBE** sent WhatsApp messages to each family unit with the U.S. point of contact they were to give U.S. immigration authorities when arrested. After six hours at the hotel, SOI-2's group was driven to the U.S. border by unknown

individuals who told them a direction in which to walk. They were apprehended by U.S. Border

Patrol agents after they crossed the border.

41.     On October 6, 2019, **CHELBE** left a WhatsApp voice recording for CW-1 to

give them an update on SOI-2's smuggling trip. In this recording, he said:

> Hey [CW-1], how are you? I spoke to [SOI-2]  Wednesday…early morning,
> between Tuesday and Wednesday, it was almost 1:00 AM. It was at the time they
> were getting into the immigration. Probably… no…[LAUGHS]…excuse me…I'm
> absolutely sure that they are at the immigration. What happens is that previously it
> wasn't taking much time at the immigration. Generally, it took around three  days,
> it was very quick. But the thing is, Brazilians, as usual, are always complicating
> things, uh…they have made lots of falsified documents at the immigration. And
> now they are taking DNA tests to verify if…later you do a search about it in the
> internet. You will find all the information, regarding DNA, DNA requirement for
> people crossing the border. And a DNA test isn't something that you do within two
> or three  minutes. It does take a little bit more time. Then, for this reason, it is taking
> longer…then people are…this started this week, by coincidence. Uh…until last
> week they weren't…they were doing only randomly, choosing one  or another to
> take the DNA test. Now, practically everybody has to take the DNA. Then, they
> will be taking one  week… then, I believe that tomorrow they will let them go,
> understand? By my…by my calculations. They got in on Tuesday. It is taking one
> week…Tuesday to Wednesday… then it will be between Monday and Tuesday.
> That is how long it is taking these days. Everybody that got in…for example, who
> got in on Saturday…last Saturday, was released the day before yesterday…the
> night between Friday and Saturday. And there are lots of people…and it's delaying
> things, [REDACTED]. But you know it, at least, [SOI-2] is at the immigration, and
> we are relaxed because we know they aren't in any danger, right? They are poorly
> housed, we know that, unfortunately. When they are with us, we can provide
> comfortable accommodations and so on, but there, at the immigration, we can't do
> anything about it. This way, we are waiting…actually, it wasn't only your
> [relative]. You know, many people came in together, on the same day, right? Only
> my people were 16 persons. Probably your [relative] told you this, that the group
> was large. [SOI-2] was even helping me organize things related to the hotel, meals
> and other stuff. [SOI-2] was very helpful. I even joke with [them] that I would have
> to pay [them] instead of [them] paying me. [LAUGHS] But…then, it was a lot of
> people, not even one  has been released so far. Because the situation is the same for
> all. DNA test. So, we have to wait. But we know that the government can't hold
> these people there because of the children. They can't be held there for many days.
> So, I believe between today and tomorrow…tomorrow we may have news from
> [them], God willing. Stay calm, [CW-1], they are fine. You can rest assured they're
> fine.

42.     I believe, based on my training and experience and work on this case, that **CHELBE** was passing along information he received from SOI-2 about the situation at the United States/Mexico border for the migrants, including SOI-2, whose trip had been arranged by **CHELBE**. The information he gave to CW-1 about DNA testing was accurate, as the United States government had begun DNA testing of migrants to determine the veracity of claims that certain migrants were part of a family unit.

43.     Upon SOI-2's release from the El Paso detention facility, **CHELBE** provided SOI-2 a phone number for an unknown Brazilian male who drove SOI-2 and their family to the airport and paid for the airline tickets to Boston.

44.     On October 14, 2019, CW-1 had a consensually recorded phone conversation with **CHELBE** about SOI-2's smuggling trip. In this conversation, **CHELBE** said, "they were released yesterday, they are going home, and they are arriving tonight in Massachusetts, thank God." I believe, based on my training and experience and work on this case, that **CHELBE** was referring to the migrants' release from United States custody after being arrested for entering the United States unlawfully. **CHELBE** continued:

> Tomorrow morning, they are leaving for Boston, because there were no flights; [BACKGROUND NOISE: DOOR SLAMMING] the flights are packed, because they are releasing many people, all the flights are packed; if you want to buy a ticket [LAUGHS SOFTLY] to Boston from El Paso, there are none. … Because all the flights are packed, actually I wasn't able to buy a ticket for a boy who was released; I needed six  tickets and I managed to buy four , uh and I found one  opening, but there was no way, because they were father and son, so I needed two  openings, then I had to buy it for tomorrow morning, he will leave tomorrow morning , because there were no openings, the flights are all packed; they are releasing everyone, so now the flights are all packed.

I believe, based on my training and experience and work on this investigation, that **CHELBE** was referring to the fact that, as part of his smuggling services, he buys plane tickets for his migrants

to reach their final destination in the United States after they have entered the United States unlawfully.

### *Smuggling and Employment of CW-2*

45.     CW-2, an individual who began cooperating with this investigation after unlawfully entering the United States,[10] has provided the following detailed information about how **JESSE** encouraged CW-2 to leave Brazil and come to the United States to work at his restaurant in Woburn, Massachusetts, and how **CHELBE** arranged for CW-2 to travel from Brazil to the United States and to enter the United States unlawfully. Specifically, CW-2 said that they knew **JESSE**'s girlfriend (now wife), who lived in the same neighborhood as CW-2 in Brazil. **JESSE**'s girlfriend introduced CW-2 to **JESSE**, who told CW-2 over the phone that if CW-2 came to the United States, CW-2 would have a house and a better life. **JESSE** said CW-2 would work for him in his restaurant and would be well paid and that the fee for getting CW-2 into the United States would be subtracted from CW-2's pay.  CW-2 met **JESSE** once in person in Brazil, at which time **JESSE** showed CW-2 a picture of his restaurant. According to CW-2, **JESSE** and his wife knew that CW-2 did not have a visa or other lawful way of coming to the United States.

46.     **JESSE**'s girlfriend took CW-2 to meet **JESSE**'s brother, **CHELBE**, at **CHELBE**'s house in Brazil. At that meeting, **CHELBE** talked about payment and the need for

---

[10] CW-2 was born and raised in Brazil. CW-2 has no criminal record in the United States apart from entering the United States without authority, and I am unaware of any criminal record of CW-2 in Brazil. CW-2 has been informed by agents that their cooperation in this investigation could result in permission to remain in the United States. CW-2 has received Deferred Action and Employment Authorization from DHS as a result of CW-2's cooperation in this investigation. HSI has paid $3200 toward CW-2's debt to CHELBE/given CW-2 $1000 for their expenses/cooperation.

passports.  **CHELBE** said CW-2 would work for his brother, and the payment would be taken out of CW-2's paycheck.  **CHELBE** charged CW-2 $22,000 to smuggle CW-2 and their three children into the United States.  **CHELBE** said it would be very easy to cross the border, and that when CW-2 arrived in the United States, they would pay him.  CW-2 had no money to pay a down payment to **CHELBE** before traveling to the United States.  **CHELBE** went with CW-2 to get their passport.

47.     Approximately two weeks after **CHELBE** gave CW-2 their passport, CW-2 and their children flew from Belo Horizonte to Sao Paolo with tickets supplied by **CHELBE**.  Before leaving, **CHELBE** gave CW-2 approximately $300 for the trip.  **CHELBE** also paid for all of the flights and hotels for the trip.  CW-2 and their children stayed in Sao Paolo for approximately a day and a half at the home of friends of **CHELBE**'s before departing Brazil on a flight to Cancun that was booked and paid for by **CHELBE**.

48.     CW-2 and their children then flew to another city and went to the hotel to which **CHELBE** directed them. Later that evening, after it got dark, a Brazilian man with a van met CW-2 and their children at the hotel and drove them to a bridge at the United States border. The driver instructed them to get out, walk across the bridge and surrender to U.S. authorities.[11]

---

11 U.S. Customs and Border Protection (CBP) records indicate that CW-2 and their child applied for asylum at the United States Port of Entry in El Paso, TX.  CW-2 provided CBP with a United States point of contact: telephone number ***-***-0733. This number is a YMAX Communications Corporation number. The account holder for this number is **CHELBE**.  The significance of this account is described further below.

49.     When CW-2 encountered immigration authorities in the United States, CW-2 told them a story about what happened to them in their past involving the other parent of CW-2's children, which CW-2 says was a true story. Specifically, CW-2 said that their children's father got in a lot of fights, used drugs and died in a crossfire.  **CHELBE** instructed CW-2 to tell that story, saying everyone needs a story in order to enter the United States.  CW-2 spent 5-10 days in "jail" before being released to a shelter.  Once CW-2 got to a shelter, CW-2 gave the shelter personnel the name and number of a U.S. point of contact that **CHELBE** provided to CW-2 when they were at the shelter.  CW-2 did not know this person and had never spoken to them but told the shelter personnel that this was someone who was sponsoring them.

50.     After CW-2 and their children left the shelter, they flew to Boston.  **CHELBE** arranged for them to get to the airport.  Before this, CW-2 had no idea where in the U.S. they would be going but understood it would be somewhere near **JESSE**'s restaurant.  When they landed, a man known to CW-2 as "Grande,"[12] who worked for **JESSE** and **HUGO**, picked them up at the airport and drove them to the house of a woman near **JESSE**'s and then they stayed with someone who used to work at **TUDO NA BRASA**.  Then **JESSE** rented a house for CW-2 and their children.

51.     Shortly after CW-2's arrival in Woburn, CW-2 began working for **JESSE** at **TASTE OF BRAZIL**.  CW-2 worked 7 days a week, from about 6:30 am to about 10:30 pm, except for Sundays after 3:00 pm.  When CW-2 began working at **TASTE OF BRAZIL**, they

---

[12] Based on information obtained during this investigation, I believe that the person known to CW-2 as "Grande" is someone who worked for **JESSE** and **HUGO** at **TASTE OF BRAZIL** and currently works for **HUGO** at **THE DOG HOUSE**.

were not sure how much they were supposed to be paid for their work, but CW-2 would only receive $100 in cash per week. CW-2 would have to ask **JESSE** for specific things they needed, and sometimes **JESSE** would give them more money. CW-2 kept track of their hours by punching a timecard. Initially, CW-2 said **JESSE** kept notes about their pay in a notebook which he kept in a safe in the office, which is next to the kitchen downstairs at the restaurant.  CW-2 said that at some point **JESSE** paid them in part by check.  Sometimes CW-2 would deposit the checks, and sometimes **JESSE** would keep the check and give CW-2 cash.  CW-2 worked for **JESSE** for about three years.

52.     In addition to working for **JESSE** at **TASTE OF BRAZIL**, CW-2 began working for **HUGO** at **THE DOG HOUSE** shortly after it opened.  CW-2 worked as a cleaner at **THE DOG HOUSE** from approximately 6:00 a.m. to 9:00 a.m. seven days a week, for which **HUGO** paid CW-2 initially $800 per month, then raised it to $1,000 per month and then went back to $800 per month, always in cash.  CW-2 did not see **HUGO** keep any records.  CW-2 did not have to punch a timecard at **THE DOG HOUSE.** At 9:00 am, CW-2 would go to work for **JESSE** at **TUDO NA BRASA**.  **JESSE** told CW-2 that they needed to give him some of the money to pay off **CHELBE**.  CW-2 would usually only keep $100-$200 and give **JESSE** the rest.  According to CW-2, **HUGO** knew that CW-2 came to the United States with **CHELBE**.  CW-2 recounted one time when **JESSE** told CW-2 that he was going to give CW-2 this cleaning job so CW-2 could pay their debt, and **HUGO** was present and heard this.  **JESSE** would sometimes tell CW-2 how much they still owed on their debt and other times would say CW-2 was getting close but would not say how much CW-2 still owed.

53.     One of CW-2's children also worked for **JESSE** at **TASTE OF BRAZIL** for a time but quit due to **JESSE**'s verbally abusive behavior. Another of CW-2's children worked for

**HUGO** at **THE DOG HOUSE** during its construction, helping to build out the restaurant as a carpenter and doing finishing work as a painter.

54.     According to CW-2, CW-2 paid **CHELBE** $800 per month for the first six months, once paying **CHELBE** directly by wiring the money to a bank account in Brazil that **CHELBE** specified; and for the other months, **JESSE** withheld money from CW-2's cash payment for work to pay down CW-2's smuggling debt.

55.     After about six months, CW-2 began paying down their debt by giving **JESSE** the $1,000 per month that **HUGO** paid them to clean **THE DOG HOUSE**. CW-2 paid **JESSE** at **TASTE OF BRAZIL**, usually in **JESSE**'s office. CW-2 paid **JESSE** in cash, which he put into a safe in his office. On one occasion, CW-2 paid Relative 1 at **JESSE**'s suggestion.

56.     On September 3, 2019, CW-2 made a payment at agents' direction on their smuggling debt to **JESSE** at **TASTE OF BRAZIL**. CW-2 consensually recorded the meeting. CW-2 had made arrangements to give the payment to Relative 1 at the restaurant, but Relative 1 did not show up. CW-2 asked **JESSE** if he could take the money. **JESSE** responded, "If you want to leave, leave it here. I will give it to [Relative 1]." CW-2 then asked **JESSE** how much he thought was still pending on their debt to **CHELBE**. **JESSE** denied knowing and said the matter was between CW-2 and **CHELBE**. **JESSE** went on to say that he does not "take … money anymore." Based on my training and experience and work on this investigation, I understand **JESSE** to be saying he does not collect smuggling debt payments anymore. He continued, "I'm getting this one because you want to leave [it] for [Relative 1]. [Relative 1] is only coming at four  o'clock and **CHELBE** had already told me that you would leave some money for [Relative 1]." During further discussion of CW-2's smuggling debt to **CHELBE**, **JESSE** said, "if you … gave him three thousand, you still owe him nineteen thousand dollars. If you gave him five thousand, you still

25

owe him seventeen thousand dollars. and you didn't give this to him. … [T]he faster you pay this debt, the better it is for your life." CW-2 said, "The only debt I made was this damn thing …." **JESSE** responded, "Oh … Why don't you go back there, gosh?! … You call him [**CHELBE**] and thank him to have put you in here, without one cent. … For giving you the opportunity. Giving an opportunity to your kids."

57.     On September 10, 2019, at 3:21 pm, **CHELBE** left a voice recording for CW-2 in which he said:

> Let me tell you, I am just waiting for an answer from **JESSE**, to check how much is left over from that time that **JESSE** sent…because he made a mess of it…do you remember it? First, he said it was one amount, later he said it was another. Then, afterwards I talked to him and he sent me the file, but it was on my other telephone.

Based on my training and experience and work on this investigation, I believe **CHELBE** was referring to an amount of money that **JESSE** transferred to him that was meant to be applied to CW-2's smuggling debt.

58.     On September 18, 2019, at 8:09 am, CW-2 left **CHELBE** a voice recording in which they said in part:

> Hey, **CHELBE**, I don't understand why you are losing it. Because I started paying the debt, I don't know why...now, I don't owe more than…the...I asked **JESSE** about the debt. I don't owe more than $20,000, my friend. I gave around 4,000, 5,000 already…I already gave, you know?! And I don't owe this debt…more than what he said. He said, "you owe more than that." Because he wants to charge interest. He said he wants to charge interest.

59.     On October 1, 2019, CW-2 had a consensually recorded (audio and video) conversation with **HUGO** at **THE DOG HOUSE**. In this conversation, HUGO pointed out parts of the restaurant that were dirty and told CW-2 the cleaning is too much work for CW-2 to do alone and that CW-2 wastes too much time.  CW-2 referred to their financial struggles, including being late on rent, and said, "I even thought about going back to Brazil, but how can I go back? If

I have this debt. I don't even know how much I owe." **HUGO** responded that the problem was that

CW-2's children were lazy and did not want to work and help pay CW-2's bills.  He denied that

they could not find work because of their poor English, saying,

> Lots of woman need people to clean their homes. … If she is good in what she
> does…are you kidding? I can find a truckload of jobs for her. … Let me tell you
> one thing, if you get into…into…into…that Boston…that thing about Boston in the
> internet… there, there always is. You go there one  day…two days…if you are good
> at work, the guy will keep you. If you are bad at work, he… He will not keep you.

**HUGO** then suggested that one of CW-2's children help with the cleaning.  After more discussion

about cleaning the restaurant, CW-2 again said they had no money in their bank account, adding

"if it wasn't for this debt, my friend, I think I would have left. … They say America, America …

not everything is America."  **HUGO** responded:

> … [I]f you were here by yourself…uh…uh…I can guarantee you that you would
> have a lot of money…you would have paid…if you were here by yourself, working
> the way you work, you would have paid your debt and had money left.

CW-2 said, "Your dad told me this as well.  If I had been here alone, I would have already paid

my debt."  **HUGO** continued:

> Yes.  So, imagine this, how much do you pay in rent?  … [I]f you were alone, just
> then…just an example, you could rent a room for $300. In only, in only one month
> you would be saving $1,300.

60.     I believe, based on my training and experience and work on this investigation, that

**HUGO** was advising CW-2 to tell their children to move out so that CW-2 could pay less in rent

and more easily pay off CW-2's smuggling debt to **CHELBE**.  CW-2 complained that another

worker was making $800 per week and has already paid **CHELBE** $5,000.  **HUGO** responded, "I

will show you the papers that he signs. He makes 400, 500." **HUGO** asked CW-2 how much he

owed them for the cleaning. After CW-2 said, "Thousand," **HUGO** walked with CW-2 over to

**TASTE OF BRAZIL**. They walked downstairs to the office, where **HUGO** took $1,000 in cash

out of a safe, counted it, and gave it to CW-2.  I believe, based on my training and experience and

work on this investigation, that this was an under-the-table payment of wages to CW-2 in cash so

that **HUGO** could evade payroll tax and withholding obligations on the wages paid to CW-2. On

October 3, 2019, CW-2 sent a text message to **CHELBE** over WhatsApp in which CW-2 denied

that they owed $24,000. **CHELBE** responded immediately by voice recording over WhatsApp,

> Hey, [CW-2], I told you this before. I'm not the one who is controlling this. It's
> [my wife], because I don't have any room in my head to keep track of all of this
> and I don't have time either, because I'm dealing with the store, so I'm busy all
> day…then, she passed on this information. [BACKGROUND: NOISE] You check
> with her and check with **JESSE** as well, if it was this amount, the part that he has
> sent…and you check your own records as well, to see if [my wife]'s math is right.
> If there is any discrepancy, you let me know; I'll talk to [my wife] and I'll try to
> find out if there is something wrong and what is wrong, so she can fix it. Sounds
> good? Thank you.

CW-2 responded immediately by voice recording,

> I know it. But our deal was 22,000. **JESSE** told me it was 22. For the three. Why
> is it this value now? I don't understand it, man! **JESSE** told me it was 22,000. You
> told me this as well, 22,000…for the three.

**CHELBE** responded by voice recording,

> [CW-2], before you talk to **JESSE**, ask other people…before you talk to
> **JESSE**…sometimes…ask someone that you know that has arrived through
> Mexico... other people [BACKGROUND: NOISE] that are there. Uh…ask
> [Individual 1] that is there…that works in the restaurant with **JESSE**. Uh…who
> else can you ask? Uh…this boy, [U/I], that works…that is working with **JESSE** as
> well…with **HUGO**. Uh… I don't know…there ought to be more people that you
> know that arrived through Mexico. [BACKGROUND: NOISE] You have to ask
> other people first. What is the amount that they are paying? "What is the amount
> that their paid to come there, to the United States?" How much is this trip? Is it
> $100? Is it $500? $100,000? How much is a trip like this one? From, from Brazil
> to the [BACKGROUND: NOISE] United States, going through Mexico?
> [BACKGROUND: NOISE] This is the question that you have to ask other people
> first.

CW-2 responded that they were not going to ask others what they paid, because they are absolutely sure that their deal with **CHELBE** was for $22,000. CW-2 then responded by voice recording,

> I know [Individual 2]. [They] came through Mexico. [Individual 3] came…[they] paid eighteen …they are paying it. I don't know if they are late because they are unemployed. Look at how much you charged [Individual 2]; [Individual 1]'s brother; uh… their family that is coming now. These are the only ones I know…[Individual 2]'s father, that you have made a deal with. Then, so far there is nobody else that I know of. Then…uh…my deal was this…and where is the money that I gave to **JESSE**, gosh? Where are the months that I have worked for **JESSE**?  He said I could be carefree… I know you don't have anything to do with this, because it's me and him who takes care of my payments. Then, he and I will discuss this.

**CHELBE** responded by voice recording in part:

> Nobody would have taken you there, you guys didn't have a single penny in your pockets ...Maybe it wasn't a good idea for you guys to go to America. Maybe it was fine wherever you were here. But you guys asked me. I helped you ... You can do whatever you want. You can say, "**CHELBE**, I'm not going to pay you." Done. It's over. But there is someone up there that is looking out for me…He is looking out for you. He controls our destinies. He controls everything that happens in your life…good things and bad things. I'm a man of faith. I'm a man of faith. Then, I know what I'm doing for people…how I am helping.

I believe, based on my training and experience and work on this investigation, that **CHELBE** was referring in this conversation to the many people that he has smuggled into the United States and what he charged them and to the fact that, unlike other smugglers would have done, he agreed to smuggle CW-2 and their family without any down payment.

61.     On October 16, 2019, **CHELBE** left a voice recording for CW-2 asking them if CW-2 could "look after" a boy for a few days in exchange for money. I believe, based on my training and experience and work on this investigation, that **CHELBE** was trying to make

arrangements with CW-2 for housing and childcare for one of the minor migrants he had smuggled into the United States, which is part of the smuggling services he provides.

62.     Between October 29 and November 1, 2019, **CHELBE** left a series of voice recordings for CW-2 asking them to give their next smuggling debt payment of $700 to Individual 5, who was one of the recently arrived migrants, instead of sending it to **CHELBE**, because Individual 5's spouse had given **CHELBE** $700 in Brazil, and Individual 5 had borrowed $700 from **JESSE** to pay their rent. As background, on October 1, 2019, Individual 5 illegally entered the United States with their one-year-old son and purported spouse, Individual 6. All three were apprehended by U.S. Border Patrol agents assigned to the El Paso Station. Individual 6 claimed to be married to Individual 5 and told agents they were the biological parent of the minor child.  It was later determined through DNA testing that Individual 6 was not the biological parent of Individual 5's son. Individual 5 was released on GPS monitoring and on October 15, 2019 flew to Boston from El Paso, Texas with their son. Agents and other investigators conducted physical surveillance of the arrival of Individual 5's group at Logan Airport in Boston. While waiting to be picked up, Individual 5 sat down on a bench next to an HSI Special Agent. Individual 5 asked the agent if he spoke Portuguese, and he said he did not, but the two had a brief conversation using the Google Translate app on the agent's phone. The agent asked if Individual 5 was being picked up by someone, and they said yes and asked to use the agent's phone. Individual 5 asked the agent if he had WhatsApp on his phone, and he said he did not but could download it. After downloading WhatsApp, the agent handed the phone to Individual 5, who typed the number +********* **3586** into the agent's phone. This is **CHELBE**'s number. Individual 5 could not reach **CHELBE** in this call and ended up using the phone of another individual in their group. Individual 5 was picked up by someone driving a vehicle registered to Individual 7. Individual 7 is a former employee of

30

**TASTE OF BRAZIL** who entered the United States illegally on July 16, 2016. Individual 7

provided agents a United States point of contact for Relative 3, who is a child of one of **CHELBE**'s

siblings. I know from my work on this investigation that **CHELBE** frequently gives Relative 3's

contact information to smuggled Brazilians for assistance with United States immigration

matters.[13] After departing the airport, Individual 5 was driven to **TASTE OF BRAZIL**. Individual

5's Enforcement & Removal Operations (ERO) GPS bracelet showed they were at the restaurant

for approximately 50 minutes.

  63. On November 1, 2019, CW-2 left a voice recording for **CHELBE** in which CW-2

said they had already asked **HUGO** to deduct the cleaning money all at once so it will not generate

interest:

> Don't keep charging me interest and things like that. Then, you could talk to him
> to see what he…because he doesn't answer me. To see if he can keep the money
> directly and not give it to me. It's better, because we finish this thing right away
> and, and it won't come to me…uh…I will not be charged more interest.

CW-2 was referring to the fact that they wanted **HUGO** to keep all of their cleaning wages and

give the money directly to **CHELBE** to pay down CW-2's smuggling debt more quickly so they

did not have to pay interest to **CHELBE**. A few minutes later, **CHELBE** left a voice recording

for CW-2 saying,

> Hey, [CW-2], you can leave it, that I will resolve this. I will talk to **JESSE**
> [BACKGROUND: NOISE] and I'll talk to **HUGO** and we'll solve this over there.
> Don't worry about this. [BACKGROUND: NOISE] It's going to be alright. Okay?
> God bless." He followed this with another voice recording saying, "Hey [CW-2],
> [LAUGHS SOFTLY] Even I sometimes have difficulty talking to **HUGO**, you

---

[13] On October 30, 2019, Individual 5 reported to the DHS/ICE office of Enforcement and
Removal Operations (ERO) in Burlington, MA. During an interview conducted during that visit,
Individual 5 claimed to have paid their own way to Mexico and entered the United States on their
own without the assistance of a smuggler.

know, he always calls me, I leave a message and he calls me, but I'll talk to him today, you can rest assured, as soon as I talk to him, I'll let you know, okay? Thank you!

64.    On November 2, 2019, CW-2 had a consensually recorded conversation with **JESSE at TASTE OF BRAZIL**. At the beginning of the recording, **JESSE** is on the phone and can be heard saying, "Oh shit! Look here; I, I, I don't know, Chelbe, I won't, I won't get into this, I'm just going to tell you how it is; talk to you partner, you talk to your partner, talk to your partner there and tell them that they are not paying; that's all there is, I don't care; alright Chelbe, alright. I know, okay my brother, be with God, bye, bye." Based on my training and experience and work on this investigation, I believe **JESSE** was referring to an unpaid debt owed to **JESSE** by **CHELBE**'s partner in the migrant smuggling business. After another brief phone conversation, **JESSE** turned to CW-2 and said, "Let me tell you one more thing, you are playing with fire.…" The conversation continued:

| | |
|---|---|
| CW-2 | Mm-hmm, I already know it. |
| **JESSE** | The problem is that you don't care about shit; you don't care about my things; you don't care about anything. |
| CW-2 | **CHELBE** said that I am playing with fire. |
| **JESSE** | That's true; I'm telling you; It doesn't matter to me, to me it makes no difference, I'm just putting this here for you to see… [U/I]. |
| | [VOICES OVERLAP] |
| CW-2 | If you want to put the woman at the house; if you want to put the woman at the house; leave her at the house, pay her rent and I'll hit the road; the end; It's as simple as that to resolve. You ask her |

32

to stay until February, like it's under your name, you can leave her there, no problem; it makes no difference to me, and starting tomorrow, that's it, I'll leave the house. It's simple to resolve. And then I'll go away; if I have to play with fire…

**JESSE**         [U/I] You are playing with fire, for sure.

                   [VOICES OVERLAP]

CW-2          Yessss and so, I am aware that I'm playing with fire, you just finished saying…

                   [VOICES OVERLAP]

**JESSE**         [CW-2].

                   [VOICES OVERLAP]

CW-2          There is no problem … don't bring my [child] into this … there is no problem.

**JESSE**         It's him.

CW-2          Yes, there is no problem.

**JESSE**         It's him.

CW-2          There is no problem. This, what you are saying that's him, there is no problem.

                   [VOICES OVERLAP]

**JESSE**       [U/I] You are playing … [U/I].

CW-2       Yes, we are playing **JESSE**…if we get burned, if we get burned, where are we going to go? We'll be underground, right?

**JESSE**       Sometimes not.

CW-2       Is not underground?

          [VOICES OVERLAP]

**JESSE**       Sometimes not.

CW-2       If you are burned by fire, where do you go? Goes underground.

**JESSE**       Sometimes not.

CW-2       Underground, and if you go underground, that's it, no more problem, it's solved.

          [VOICES OVERLAP]

**JESSE**       Sometimes, some people get burned and they suffer… they suffer.

          [VOICES OVERLAP]

CW-2       There is no problem, there is not a problem, above the ground there is no problem; the only problem is if the person goes underground. Only. And if you are underground the problem is over. It's simple. The end. [BACKGROUND: VIBRATION SOUND] I think they have to do what they have to do and that's it.

**JESSE**        …I am just telling you. Why are you, why are you like that?

CW-2        I am not like that Jesse! Why?!

            [VOICES OVERLAP]

**JESSE**        Why don't assume your responsibilities, your commitments? Why don't you do the right thing?

CW-2        I am doing it…

**JESSE**        No, you are doing [U/I].

            [VOICES OVERLAP]

CW-2        I am here working for you! Do I leave this place?!

            [VOICES OVERLAP]

**JESSE**        [U/I] I am not talking about that; I'm talking about the way you manage your finances.

            [VOICES OVERLAP]

CW-2        I am doing it; I am doing it…I live inside this place, I'm always inside this place;

            [VOICES OVERLAP]

**JESSE**        And it's not working.

            [VOICES OVERLAP]

CW-2            I get here at 9:00 in the morning, I clean; don't do that to me…

                [VOICES OVERLAP]

**JESSE**        But why don't you manage the rest? Why don't you pay the bills?

                [VOICES OVERLAP]

CW-2            Because it's just me, it's just me for now working.

                [VOICES OVERLAP]

**JESSE**        Not for now, for your whole life.

                [VOICES OVERLAP]

CW-2            There is no problem **JESSE**! That's the way it is, I am a [parent]!

                [VOICES OVERLAP]

**JESSE**        No, but you have your commitments.

                [VOICES OVERLAP]

CW-2            I am a [parent]!

**JESSE**        Nothing to do with being a [parent].

CW-2            Oh **JESSE**, there is no problem; let's go, let's go see what I owe
                here …

65.     On November 3, 2019, CW-2 had a consensually recorded conversation with **HUGO** at **THE DOG HOUSE** in which they told him that their electricity had been shut off and CW-2 asked **HUGO** to lend them money so they did not have to borrow from someone who charges interest:

| | |
|---|---|
| CW-2 | You lend this money here until Wednesday. I know who has it and will lend me $1,000 for me to replace the money, understand? If I don't pay…uh…this…Tuesday, I will be without electricity. Can you believe it? [U/I] Thank God, I'm sure [U/I] then, on Wednesday a person will lend me $1,000 for me to pay with interest. I will not pay with interest. Because I need…I will stay without electricity. Then, I will do like this, then, I will…I will tell him that, starting next month, I will forget about this money, you know? I…[U/I] don't know…he already sent me I don't know how many texts, that it was for me to get it with you to pass it on to your father. Then, I said to him, "Hey, hey **CHELBE**, who knows if you…Hugo, passes on the money of my cleaning?" |
| **HUGO** | No. I don't have anything [U/I]…I don't want…I don't even… like…I don't have anything, anything to do with this. I don't like problems. |
| CW-2 | Mm-hmm. |
| **HUGO** | I don't have nothing… |
| CW-2 | I will talk to him because I need to pay this Tuesday. |
| | [VOICES OVERLAP] |
| **HUGO** | [U/I] I prefer, I'd rather not know what you guys are doing. To tell you the truth. |
| CW-2 | Mm-hmm. Then, would it be possible for you to deduct the 300 from me next week? |
| **HUGO** | I will tell you…I will need to take it from next week's then. |
| CW-2 | Mm-hmm. |
| **HUGO** | [U/I]. |

CW-2          You can take it from the next.

I believe, based on my training and experience and work on this investigation, that when **HUGO** said, "I'd rather not know what you guys are doing," he was well aware that CW-2 was referring to their smuggling debt to **CHELBE** but wanted to preserve his deniability because he knew it was an illegal arrangement under which they came to, entered and remained in the United States unlawfully.  I believe that when **HUGO** agreed to deduct $300 from CW-2's wages for the next week, he was agreeing that that money would be paid to **JESSE** to reduce CW-2's smuggling debt.

66.      On November 23, 2019, CW-2 reported that another family had arrived and that **JESSE** had asked CW-2 to host them. Based on my training and experience and work on this investigation, I believe this refers to another family that **CHELBE** had smuggled into the United States for whom **JESSE** was trying to obtain temporary housing.

### *Information from SOI-1 and Obtaining Fake Documents for Employees*

67.      A Source of Information (SOI-1), who is a Brazilian national who was smuggled into the United States by **CHELBE**, provided information about **CHELBE**'s smuggling operation and SOI-1's employment at **TASTE OF BRAZIL**.  According to SOI-1, SOI-1's parent, CW-2, paid **CHELBE** to smuggle the family unit into the United States.

68.      Upon arrival in Boston, SOI-1 and their family were picked up at the airport by an individual called "Grande," who drove them to **TASTE OF BRAZIL**.  I am aware from this investigation that "Grande" is the nickname for a longtime employee of **JESSE** and **HUGO**.

69.      SOI-1 stated **JESSE** employed them as a dishwasher at **TASTE OF BRAZIL**. SOI-1's shift was from 8:00 am to 11:00 pm.  **JESSE** would pay SOI-1 but subtracted SOI-1's smuggling debt to **CHELBE** from SOI-1's pay. **JESSE** paid SOI-1 in cash and would decide how much to pay.

70.     When SOI-1 began work at the restaurant, **JESSE** and **HUGO** talked to SOI-1 about getting fake documents from **CHACON-GIL**.  SOI-1 knew **CHACON-GIL** by sight, because **CHACON-GIL** occasionally worked at **TASTE OF BRAZIL**.  SOI-1 said **JESSE** loaned them $200 cash to give **CHACON-GIL** for the documents. SOI-1 stated that **CHACON-GIL** gave them the documents in **TASTE OF BRAZIL**, instructing SOI-1 not to talk about this transaction and claiming he had nothing to do with it. SOI-1 stated **HUGO** deducted the $200 from their paycheck in installments until the loan was repaid. SOI-1 handed the envelope with the documents to **JESSE**, who then called **HUGO** over and handed the envelope to him.  **HUGO** advised the SOI to not walk around with fake documents because SOI-1 could get arrested. **HUGO** said it would be best if **HUGO** kept the documents, and he did so.

71.     **JESSE** reportedly threatened SOI-1 on multiple occasions if SOI-1 didn't pay the smuggling debt owed to **CHELBE**. **JESSE** would claim he knew people that would send SOI-1 to Brazil. **JESSE** would claim that once in Brazil, these people would exterminate SOI-1 and their family.

72.     SOI-1 stated that **HUGO** would tell them to pay **CHELBE**. **HUGO** would reportedly warn SOI-1 that his uncle (**CHELBE**) works with dangerous people that would find SOI-1 wherever they go.

73.     SOI-1 stated that they made a $600.00 smuggling debt payment to **CHELBE**'s relative (Relative 1). SOI-1 estimates this was approximately six months after their arrival in the United States.

74.     SOI-1 stated they made additional smuggling debt payments to **CHELBE** by wiring money via Western Union to unknown individuals in Mexico. **CHELBE** would reportedly subtract the amount of these wires from SOI-1's debt.

75.     CW-2 advised that they also obtained identity documents from **CHACON-GIL** in approximately the fall of 2018.  CW-2 described the circumstances leading up to this purchase as follows.  CW-2 said that **JESSE** told CW-2 they would need a Social Security card to work in the restaurant.  He gave them a contact for a man named **MARQUITO** (nickname for **CHACON-GIL**) who supplied CW-2 with a Social Security card.  On another occasion, CW-2 explained that they were arguing with **JESSE** in the kitchen of **TASTE OF BRAZIL** when **HUGO** overheard and asked what was happening. CW-2 explained to **HUGO** that they were not getting paid enough money to support themself.  **HUGO** advised CW-2 to buy identity documents, and they would start getting paid by check directly from him, instead of from **JESSE**.

76.     Days later, CW-2 recalls they were again crying at work and **HUGO** called them into the restaurant office.  **HUGO** reportedly asked why CW-2 was crying.  CW-2 explained to **HUGO** that **JESSE** was keeping most of their earned money to pay **CHELBE**.  **JESSE** reportedly would only allow CW-2 to take $100 per week.  CW-2 said that **HUGO** told them that his father's actions were wrong.  **HUGO** reportedly stated the right thing would be for CW-2 to get paid and then pay their smuggling debt directly to **CHELBE**, not **JESSE**.  **HUGO** then told CW-2 that there was a person named **MARQUITO** that made everyone's documents at the restaurant. **HUGO** advised CW-2 to ask another restaurant employee for **MARQUITO**'s phone number to get the documents made.

77.     CW-2 contacted **MARQUITO** and was instructed to give him a photo and their biographical information.  Approximately one week later, **MARQUITO** came to the restaurant and delivered the documents to CW-2 while they were working in the kitchen. CW-2 believed they paid **MARQUITO** $180 or $200 for the documents.  CW-2 did not know what a Social Security card was and did not know that the documents were fake.

40

78.     CW-2 stated they went into the restaurant office, told **HUGO** that **MARQUITO** had delivered the documents and handed them over to **HUGO**. The next day, **HUGO** returned the documents to CW-2, and they began receiving regular pay checks.

79.     On February 4, 2020, as part of this investigation, CW-2 contacted **CHACON-GIL** via WhatsApp and requested fraudulent documents for employment purposes. **CHACON-GIL** agreed to provide fraudulent documents for a fee of $200. On February 20, 2020, CW-2 had a consensually recorded meeting with **CHACON-GIL** at **TASTE OF BRAZIL** to purchase the fraudulent documents. Agents conducting physical surveillance of the meeting saw **CHACON-GIL** arrive at **TASTE OF BRAZIL** on a motorcycle. During this meeting, **CHACON-GIL** gave CW-2 a fraudulent Social Security card[14] and a fraudulent Permanent Resident card in exchange for $200 in official U.S. government funds that agents provided to CW-2 in advance for this undercover purchase. During this meeting, Individual 1 was present and referred to **CHACON-GIL** by his first name, which Individual 1 knows because **CHACON-GIL** formerly worked at **TASTE OF BRAZIL**. In the presence of **CHACON-GIL**, CW-2 said, "Other time I did a document with Marquito, and he charged me $180. Now that I did this new document, this smart as[s] charged me $200." **CHACON-GIL** did not respond. The conversation continued:

| | |
|---|---|
| CW-2 | Where's the document, but with an ugly, horrible picture!" |
| Individual 1 | I only did the Green Card because of the payment. I have to. Do you think that I would do this shit? [U/I] Now that I have the Social Security Number, do you think I need? I'm a [person] with a Social. |

---

[14] The Social Security Administration Office of Inspector General has confirmed that the Social Security card is fraudulent.

41

| CW-2 | Wow, a [person] that has a Social! If you have a Social, you are good, right? [ASIDE: SPANISH: you have everything] [BACKGROUND: UF: You have everything.] [ASIDE: Thank you very much, Marquito [nickname for **CHACON-GIL**]. When you need it again, you will do it, won't you? |
|---|---|
| Individual 1 | I have a Social Security, I'm a [person] that has a Social Security card. |
| CW-2 | When you need it again, you will do it, won't you? |
| **CHACON-GIL** | [PORTUGUESE, SPANISH CROSSOVER: I will give you the phone number of the guy [LAUGHS] and I don't know how to speak [U/I]]. |

**CHACON-GIL** then said he was leaving. An unidentified male then said, "[SPANISH] [U/I] [other nickname for **CHACON-GIL**], [U/I] is it cold on the motorcycle?" After the meeting, agents took custody of the Social Security card and Permanent Resident card (Green Card) **CHACON-GIL** sold to CW-2.

### *The Use of the YMAX Accounts to Provide Fake U.S. Contact Information*

80.     The two YMAX phone numbers mentioned above, \*\*\*-\*\*\*-0733 and \*\*\*-\*\*\*-7505, have been given as a U.S. point of contact by over 40 Brazilian migrants, who have attributed the numbers to various fictitious identities.   The provider for this number is YMAX Communications Company, which provides service for MagicJack, a voice over internet protocol (VOIP) service.   The listed subscriber on the \*\*\*-\*\*\*-7505 account is an individual who purportedly lives in Wakefield, MA, but a device associated with the account is called "Iphone de Moraes."  On August 27, 2019, **CHELBE**'s relative, Relative 1, updated the account to add Relative 1's name as an alternate subscriber, along with Relative 1's phone number \*\*\*-\*\*\*-**5201** and a MasterCard credit card ending in 3189.  A pen register on this phone shows frequent contact

with airlines, hotels and travel agencies and with **JESSE**, Relative 1, **HUGO**, and the \*\*\*-\*\*\*-0733 YMAX phone associated with **CHELBE.**

### *Smuggling and Employment of SOI-3*

81.     A source of information ("SOI-3"), who is a relative of Individual 2's, was smuggled into the United States by **CHELBE**. On May 15, 2021, Border Patrol agents apprehended SOI-3 and their spouse and child after they illegally entered the United States near the Yuma, Arizona border. SOI-3 provided the following information about their smuggling trip.

82.     SOI-3 agreed to pay **CHELBE** $18,000 to be smuggled into the United States. This smuggling fee also included the illegal entry of SOI-3's spouse and child. **CHELBE** arranged for SOI-3 to get passports from a local passport office in Brazil. SOI-3 stated that they received a receipt of payment for the passports, and the passport payments were paid from a Bradesco Bank account SOI-3 said belonged to **CHELBE's** brother **JESSE**.

83.     Several days before entering the United States, SOI-3 and their family unit were picked up at their residence in Brazil and driven to an airport in Rio de Janeiro. SOI-3 stated that the driver who picked them up was related to **CHELBE's** spouse. At SOI-3's house, Geraldo also gave SOI-3 an envelope of money.  SOI-3 stated that **CHELBE** had instructed them to use the money to pay various individuals that they would encounter on their smuggling trip. I believe, based on my training and experience and my work on this investigation, that this was a reference to various people in Mexico that assist with the smuggling operation.  SOI-3 also stated that Geraldo took a picture of SOI-3 and their family prior to their flight from Rio de Janeiro and sent the photo to **CHELBE**.

84.     SOI-3 and their family flew from Rio de Janeiro to Sao Paulo. From Sao Paulo, they flew to Tijuana, Mexico. SOI-3 stated that **CHELBE** paid for their flights. At the airport in

Tijuana, Mexico, SOI-3 and their family were approached by an airport employee near passport inspection. The airport employee showed SOI-3 a photo of SOI-3 and their family that Geraldo had previously taken of them. SOI-3 stated that they understood the airport employee showing them their picture to mean that the airport employee was assisting **CHELBE** in their smuggling trip. SOI-3 stated that they paid the airport employee with money that Geraldo had given them prior to leaving Brazil. SOI-3 stated that they and their family passed through passport inspection with no issues.

85.     The family then flew from Tijuana, Mexico to Mexicali, Mexico. At the Mexicali airport, SOI-3 and their family were approached by a taxi driver. The driver also showed them the photo Geraldo had taken of them. SOI-3 paid the taxi driver $200 with money that Geraldo had given them. The taxi driver then drove them to a motel that was about a two-hour drive from the Mexicali airport. The taxi driver also gave SOI-3 a SIM card so they could continue to communicate with **CHELBE** using WhatsApp.

86.     SOI-3 and their family checked into the motel. After they checked into the motel, an individual identified as Lupito came to the family's room and informed the family that he was assisting **CHELBE**. **CHELBE** instructed SOI-3 over WhatsApp to give Lupito $1,500.

87.     SOI-3 stated that they were later driven about an hour and a half from the motel to an area close to the U.S. border. SOI-3 stated that the area appeared to be a junk yard. A Mexican female led SOI-3 and their family on foot to the U.S. border. The Mexican female did not enter the United States but directed SOI-3 and their family to go further north over the border. After crossing the border, SOI-3 and their family were apprehended by CBP agents near Yuma, Arizona.

88.     SOI-3 stated that **CHELBE** told them to erase all the messages between SOI-3 and **CHELBE** before crossing the border.

44

89.     After SOI-3 and their family were released by Immigration authorities, they flew from Tucson, Arizona to Boston, Massachusetts. SOI-3 said **CHELBE** paid for their flight to Boston.   Prior to the flight, the family was placed in a shelter in the Tucson area.  **CHELBE**'s relative, Relative 2**,** purchased food that was provided to the family at the shelter.

90.     Once they arrived in Boston, SOI-3 and their family were picked up at the airport by **JESSE** and taken to his restaurant, **TASTE OF BRAZIL**, in Woburn.

91.     SOI-3 began to work for **JESSE** at **TASTE OF BRAZIL**. SOI-3 worked in the kitchen, preparing food and washing dishes. SOI-3 and their family lived in an apartment in Woburn that was secured for them by **JESSE**. **JESSE** loaned SOI-3 and their family money for the first and last month's rent and security deposit for the apartment. **JESSE** told SOI-3 that he had paid the smuggling debt that SOI-3 owed to **CHELBE** for smuggling them into the United States and that SOI-3 now had to repay **JESSE** for the smuggling debt in addition to the money he loaned SOI-3 for the apartment.

92.     SOI-3 worked for **JESSE** at **TASTE OF BRAZIL** for approximately six months.[15] SOI-3 never received a paycheck from **JESSE** for their work during that period. SOI-3 said that **JESSE** was demanding and verbally abusive to SOI-3 during the time that they worked for **JESSE**.

93.     SOI-3 stopped working at **TASTE OF BRAZIL** due to their mistreatment by **JESSE** and began working for **HUGO** at the **DOG HOUSE**. During the last approximately three weeks that SOI-3 worked for **JESSE** and **HUGO**, SOI-3 worked at both **TASTE OF BRAZIL** and **THE DOG HOUSE**.  During this time, SOI-3 worked approximately twelve hours a day, six

---

[15] In a prior interview, SOI-3 estimated this period as approximately one month.

45

days a week.  **HUGO** gave SOI-3 a receipt for approximately $500 each week but kept the money. Instead, **HUGO** said he was giving the money to **JESSE** to pay down SOI-3's smuggling debt.[16] The only time **JESSE** gave SOI-3 any money was for a particular medical expense, and he occasionally loaned SOI-3 a debit card to pay for groceries. SOI-3 used a plastic card to clock in and out of work.

94.     SOI-3 stated they had been threatened by **JESSE** multiple times, including once in **JESSE'S** office on the bottom floor of **TASTE OF BRAZIL**.

95.     SOI-3 met with **HUGO** once in his office on an upper floor of the **DOG HOUSE**. SOI-3 saw a safe and a computer inside the office and said the office is locked from the outside.

### Illegal Reentry After Deportation By CHACON-GIL

96.     On or about August 22, 2005, investigators from the United States Border Patrol (USBP) detained **CHACON-GIL** near Rio Grande City, Texas.  **CHACON-GIL** was among a group of aliens who illegally entered the United States earlier that day by wading across the Rio Grande River.  **CHACON-GIL** admitted to having done so.  **CHACON-GIL** stated he was traveling to Los Angeles to reunite with his aunt.  **CHACON-GIL** was processed for removal, advised that he must give a valid address for immigration court (EOIR-33), and advised he could be removed in absentia if he failed to appear for court.  **CHACON-GIL** was then released on his own recognizance.

97.     Investigators determined that **CHACON-GIL** was a citizen and national of El Salvador who had traveled through Guatemala and Mexico to reach the border.  **CHACON-GIL**

---

[16] In a prior interview, SOI-3 said they were paid approximately three times by **HUGO**, but in a subsequent interview, they clarified the "payment" as above.

made no claims of United States citizenship, lawful permanent resident status, or being in possession of any immigration documents that would allow him to stay or remain in the United States.

98.     On January 31, 2006, **CHACON-GIL** failed to appear for his hearing in immigration court.  An immigration judge ordered in absentia that **CHACON-GIL** be removed to El Salvador.  The immigration judge issued a warrant of removal/deportation for **CHACON-GIL**.

99.     At the time of **CHACON-GIL**'s encounter with USBP, investigators obtained his fingerprints and photograph, which were uploaded into the Enforcement Integrated Database (EID).

100.   **CHACON-GIL** remained a fugitive with an outstanding removal warrant.

101.   On December 16, 2012, officers from the Massachusetts State Police arrested **CHACON-GIL** for unlicensed operation of a motor vehicle. Officers booked **CHACON-GIL** and found that his fingerprints matched the fingerprints associated with the 2006 deportation/removal warrant.  U.S. Immigration and Customs Enforcement (ICE) lodged an immigration detainer, and officers placed **CHACON-GIL** in removal proceedings. On December 17, 2012, a field office director of ICE issued another warrant of removal ordering that **CHACON-GIL** be removed from the United States.

102.   In immigration court in Massachusetts, **CHACON-GIL**, represented by counsel, argued that he had not received notice of the prior removal proceedings and attempted to reopen the proceedings and rescind the removal order.  The immigration judge denied the motion. **CHACON-GIL** also claimed to have a credible fear of returning to El Salvador.

103.     In the immigration court proceedings, **CHACON-GIL** admitted that he is a citizen and national of El Salvador, who entered the United States "without inspection" in 2005. **CHACON-GIL** admitted that he was living in Woburn, Massachusetts, with his son. **CHACON-GIL** reported a particular address in Woburn, MA, and was released to that address subject to conditions and supervision.

104.     **CHACON-GIL** remained released under ICE supervision until 2018.

105.     On March 6, 2018, another warrant of removal/deportation issued as to **CHACON-GIL**.  **CHACON-GIL** was removed from the United States via Boston Logan Airport on March 17, 2018.  Pursuant to this removal, the print of **CHACON-GIL**'s index finger and his photograph were added to his immigration file via ICE Form I-205. This fingerprint was taken at the airport at the time of his departure.

106.     In or about January 2020, HSI investigators learned that **CHACON-GIL** had returned to the United States and was living in Woburn under the name "Marcos Chacon."

107.     On October 3, 2022, I reviewed the alien file, or "A-File," associated with **CHACON-GIL**.  The A-File confirms the facts described above.  In addition, the photographs of the person ordered removed in 2006, the person who was in fact removed in 2018, and the person described above in connection with this investigation all appear to depict the same person.

108.     There is nothing in the A-File indicating that at any time since his removal on March 17, 2018, **CHACON-GIL** received the express consent of the Secretary of the Department of Homeland Security to reapply for admission to the United States.

109.     Based on the foregoing facts, there is probable cause to believe that **CHACON-GIL**, a native and citizen of El Salvador, who was ordered removed on January 31, 2006, and

48

who was in fact removed on March 17, 2018, subsequently re-entered the United States without having received the express consent of the Secretary of Homeland Security, in violation of Title 8, United States Code, Section 1326.

## <u>CONCLUSION</u>

Based on the information described above, I have probable cause to believe that **JESSE JAMES MORAES** and **HUGO GIOVANNI MORAES**, have violated 8 U.S.C. § 1324(a)(1)(A)(v)(I)

and (B)(i); and **TONY ANGEL CHACON-GIL a/k/a "MARQUITO" a/k/a "MARCOS CHACON-GIL"** has violated 18 U.S.C. § 1028(a) and 8 U.S.C. § 1326.

Respectfully submitted,

JAMES MICHAEL STATON
Special Agent, United States Department of
Homeland Security, Immigration and Customs
Enforcement, Homeland Security
Investigations

Subscribed and sworn to by telephone on October _____ 3 _____, 2022.

5:54 p.m.

HON. DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE